to the rule that all prior negotiations are merged in the written instrument and that its terms and conditions cannot be changed or modified by any parol agreement made prior to its execution, it should be held that the plaintiff in this action has failed to establish a cause of action.

It follows that the judgment appealed from should be reversed, and a new trial granted, with costs to the appellant to abide the event.

ROBSON, J., concurs.

---

(62 Misc. Rep. 108.)

WHALEN et al. v. GOLDMAN et al.

(Supreme Court, Special Term, New York County. January, 1909.)

1. INSURANCE (§ 570*)—PROVISIONS OF POLICY.—APPOINTMENT OF APPRAISERS.
   Where a policy of insurance provided that in case of loss disinterested appraisers should be selected, it is not necessary that the appraisers should stand absolutely unbiased; but it is sufficient if they have no interest in the result of the arbitration.
   [Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1426; Dec. Dig. § 570.*]

2. INSURANCE (§ 115*)—INSURABLE INTEREST—PLEDGEE—"OWNER."
   A pledgee of personal property is an "owner" thereof, within the meaning of an insurance policy.
   [Ed. Note.—For other cases, see Insurance, Cent. Dig. § 140; Dec. Dig. § 115.*
   For other definitions, see Words and Phrases, vol. 6, p. 5148; vol. 8, p. 7744.]

3. PLEDGES (§ 43*)—RIGHTS OF PARTIES—TRANSFER OF PLEDGOR'S EQUITY.
   Where a pledgee of personal property advances large sums to the pledgor, he will be protected as against a transferee of the equity of the pledgor, where no notice of the alienation of the pledgor's equity has been given to the pledgee.
   [Ed. Note.—For other cases, see Pledges, Cent. Dig. § 102; Dec. Dig. § 43.*]

Action by John W. Whalen and others against Henry Goldman and others. Finding for defendant Talcott as to part of the insurance fund, and case continued for further hearing.

W. Benton Crisp, for plaintiffs.
Steinhardt & Goldman (Mr. Nathan, of counsel), for defendants Goldman, Sachs & Co.
Rounds & Schurman (Arthur Rounds, of counsel), for defendant Société Marseillaise.
D. W. Richards, for defendant Talcott.
F. O. Offeld, Jr., for defendant Hartford Fire Insurance Company.

HENDRICK, J. This action was brought upon two policies of fire insurance, written for $5,000 each, to recover the proportionate amount of an award of arbitrators. The award states the loss by fire to have been $60,933.08. The insurance written aggregated $70,000. It may conduce to brevity if we designate the bankrupt corporation

---

of E. Reboulin Fils & Co., Incorporated, as the "American Company"; the three plaintiffs (being said company's representatives) as the "trustees"; the French firm, association, or corporation of L. Reboulin Fils & Cie. and its successor, L. Reboulin Fils & Cie., as the "French Company"; the Société Marseillaise, as the "French Bankers"; and the Hartford Fire Insurance Company, as the "Insurance Company." The American Company was incorporated in New Jersey on June 13, 1903. It carried on the business of preserving fruits at Elizabethport, N. J. On October 21, 1905, its creditors filed a petition in bankruptcy. On December 4, 1905, it was adjudicated a bankrupt, and the plaintiffs were appointed its trustees. The French Company was engaged at Apt, France, in the same kind of business as the American Company. The persons in control of both companies were substantially the same. Both the French and the American Company found it necessary to borrow funds. These were supplied by defendant Talcott to the American Company and by the French Bankers to the French Company. Both were secured by policies of fire insurance and by pledges of merchandise. One policy of insurance for $5,000 was issued by defendant Insurance Company to the American Company, November 16, 1904, covering merchandise contained in buildings on a certain specified block in Elizabethport. On February 8, 1905, said property was transferred to Talcott as security, and on the same day said policy of insurance was assigned to him so far as it covered the merchandise in building No. 7 on said block. On March 6, 1905, defendant Insurance Company issued to Talcott another policy for $5,000 covering the merchandise in said building No. 7. Both policies permitted further insurance, provided that defendant Insurance Company should be liable only for its proportionate amount of loss. Other insurance was effected on the same property, amounting to $60,000, so that, if the defendant Insurance Company is liable, its proportion of liability is as the ratio of $10,000 to $70,000. On March 14, 1905, a fire occurred in said building No. 7, by which a partial loss occurred, and three sets of claimants appeared in this action. The trustees claim, subject to Talcott's prior right, in behalf of the bankrupt estate; the French Bankers, through their agents, the defendants Goldman, Sachs & Co., and defendant Morrisey, their assignee, claim subject to the prior right of Talcott; and Talcott claims in his own behalf. The defendant Insurance Company denies all liability.

For the present we shall lay aside the claims of all other parties, and consider whether Talcott has any claim against defendant Insurance Company. The pleadings admit that the first policy was duly issued and assigned to Talcott, that the second policy was issued directly to him, and that both were in force at the time of the fire. But at this point they divide. Talcott claims that proofs of loss were duly filed in accordance with the requirements of the policies; that two competent and disinterested appraisers were appointed by the insured and by the Insurance Company; that said appraisers selected a competent and disinterested umpire, as required by the policies; that the board of arbitrators thus constituted examined the damaged mer-

chandise, heard witnesses, considered arguments, and made a report, in which they found the sound value of the merchandise to be $77,-576.87 and the loss to be $60,933.08. On the other hand, defendant Insurance Company claims that neither the appraiser chosen by the insured nor the umpire was disinterested; that the aribtrators were not always assembled when acting in that capacity; that a fair hear-ing was denied; that the proofs of loss contained items of damage greatly exaggerated; that the loss did not exceed $1,000; that the insured violated a condition requiring them to minimize the damage after the fire; and that the American Company substituted damaged for undamaged merchandise before it was examined by the arbitrators. In support of these claims defendant Insurance Company cites evi-dence tending to show that the appraiser selected by the insured dur-ing the year 1901 or 1902 was in the employment of the predecessor of the American Company; that his uncle, at the time of the arbitra-tion, was an employé of the American Company; that the umpire was manager of a business firm which was a customer of the Amer-ican Company; that the umpire at one time declined to hear a wit-ness produced by the Insurance Company; that the merchandise was permitted to ferment after the fire, thus exaggerating the loss; that some of the merchandise was withdrawn before the appraisal was completed; and the insurance Company submits computations to the effect that the value of the merchandise was much less than $77,-576.87.

The requirement of the policies of insurance was that the appraiser and the umpire should be disinterested. Such appraisers were not in the strict sense arbitrators, and it is not probable that either party to the policies contemplated, in case of loss, that the appraisers should stand absolutely unbiased. It is more than probable that each one selected an appraiser in whom confidence was reposed as an honest man, but that, in case of any difference, his sympathies would incline toward the party by whom he was chosen. It would be expecting too much, in the present stage of progress toward the millennium, to as-sume that either party contemplated, when entering into the contract of insurance, that the appraisers selected should be absolutely indif-ferent. These tribunals are homemade, and neither their composi-tion nor their conduct should be more closely scrutinized than is that of the tribunals selected in accordance with the statutes and long-standing judicial practice. If such appraisers are honest men, who make an honest effort to arrive at an honest award, I believe that noth-ing further can be demanded or expected. At the same time, all ap-pearances of fraudulent or unfair practice should meet with the dis-approval of the courts. How far the parties intended to differentiate between bias and interest is not apparent, but I think there is a dis-tinction; and, if each party was satisfied that the opposing appraiser was free from interest, he should not have been surprised to find that he was not entirely free from bias. It would not be an extremely easy undertaking to find either an appraiser or an umpire, in a business as limited as is that of preserving fruit, who would be an entire stranger to both parties in the case. It should be kept in mind, too,

that during the last months of the arbitration the American Company was in the bankruptcy courts, and neither appraiser nor umpire could have been influenced by the interested purpose of so conducting the arbitration as to secure approval and future business.

In view of the evidence and the appearance of the witnesses during the trial, I am satisfied that the board of arbitrators was properly constituted; and, while the hearings were not characterized by the formal niceties of procedure which are supposed to obtain in a court of justice, there seems to be no substantial ground for declaring that the arbitrators did not carefully examine the merchandise, listen to all the evidence, and consider all the arguments adduced. The defendant Insurance Company never gave notice to the insured of any intention to rescind the arbitration agreement, but continued on to final submission, although as early as October 23, 1905, the company seemed to know all the facts with reference to the alleged interest of the arbitrators; for on that day its representative wrote to the arbitrators that the company declined to participate further. No member of the board of arbitrators was incompetent, and none of them had any interest in the result of the arbitration that was of either a legal or equitable nature. The umpire stated to one of the agents of the Insurance Company that he would not listen to any argument or statement of views during the examination of the merchandise in which he was then engaged; but the evidence does not show that the arbitrators refused to hear any witness who was produced or to consider any argument which was advanced. Nor is there any force in the objection that either the arbitrator chosen by the insured or the umpire was an interested party. Employment by the predecessor of the American Company three or four years previously, a relationship in the second degree with a present employé, or connection with a firm which has some business transactions with a corporation adjudged to be a bankrupt several months before an award is made, cannot be evidence of interest sufficient to vitiate the result.

As the action is brought to recover the loss as represented by the award alone, and none of the answers alleges a cause of action for the loss aside from the award, the facts on which the award is based have not been placed before the court. The evidence addressed, however, to the issue of fraud in obtaining the award, has been sufficiently full to show that the claim for damage is one of great difficulty. How long the fire burned before it was discovered, what effect the heat had on the fruit inclosed (some in light and some in heavy cases), how much of the damage by fermentation was caused by the fire, how much of the loss subsequent to the fire could have been prevented by the insured by methods which would not vitiate or release the insurance policies, what changes were made in the contents of the building between the time of the fire and the award—these and other questions of fact could be answered only after a careful investigation. As the arbitrators made personal examinations, took the evidence of experts (some of whom were employed by themselves), and heard the testimony of other witnesses, they have probably reached a conclusion as nearly right as the difficulties inherent in the situation would permit. At any rate, the evidence does not lead

to the conclusion that the award was fraudulent, collusive, or unfair. I therefore conclude that the award of $8,704.72 against defendant Insurance Company, being one-seventh of the total loss of $60,933.08, must be sustained.

The contention of the Insurance Company that Talcott's loss must prorate, not only with the $70,000, but with the $170,000 other insurance, does not impress me as tenable. All of the policies for the $170,000 insurance contained the clause: "This policy does not cover on property specifically insured." The other policies held by Talcott, aggregating $70,000, covered the specific merchandise contained in building No. 7. That merchandise, therefore, was not covered by the other policies, and there can be no claim against it for contribution. Nor do I think that the Insurance Company's contention that Talcott lacked the insurable interest represented ought to prevail. The facts were laid before the Insurance Company's agent when the first policy was assigned and when the second policy was issued. Talcott did have an insurable interest, and there was no reason why it should be misstated. Whether he was simply a pledgee, or whether he was in some sense a trustee, he did hold the legal title, and within the equity of the contract he was owner of the merchandise.

The parties admit that Talcott lent the sum of $32,301.92 to the American Company, for payment of which he has a prior lien on the $8,704.72, due on the two policies in suit. The evidence and arguments, however, carry us beyond those policies. Talcott claims a total sum which, with interest to January 15, 1908, amounts to $72,497.13. The surplus of about $40,000 consists of loans made to the American Company after the fire, interest on the loans, and certain expenses. The trustees and the French Bankers claim that as to said sum of $40,000 they are entitled to a prior lien on the total insurance. Talcott claims that under his original agreement, and under an agreement made subsequently to the fire, he made additional loans from July 28 to October 18, 1905, amounting to $44,100. He also claims that on June 20th he was authorized by the American Company to retain from the collateral held by him the amount due, "including any expenses incurred in connection with the adjustment or collection of the loss." It has also been stipulated that he should be compensated for certain sums paid by him in connection with the arbitration. These expenses as claimed, with interest to January 15, 1908, aggregate $9,726.13. The claim of the French Bankers aggregates about $61,201.92, including interest, of which $28,900 is alleged to have been advanced to the French Company between June 6 and July 31, 1905, and $28,825 is alleged to have been advanced to the French Company between July 13, and October 20, 1905. The allegations are that in June, 1905, for value received, the American Company transferred to Goldman, Sachs & Co., as agents of the French Bankers, assignments of the insurance moneys due on the policies for $70,000, subject to the $32,-301.92 prior lien held by Talcott, with interest, and also the whole of the insurance for $170,000. The consideration alleged to have been proved is that said sum of $28,900 was really borrowed for the benefit of the American Company, and that said sum of $28,825 represents drafts accepted, but not paid, by the American Company.

It is argued by the parties opposed to the French Bankers that the insurance was not assigned to them by authority of the American Company; that the moneys were not loaned by the French Bankers to the French Company for the benefit of the American Company; that the drafts were not accepted by the American Company, and, even if they were so accepted, it was done for the accommodation of the French Company; that as to part, at least, of the claim of the French Bankers, the assignments contravened the rule against preferences; that the drafts were not discounted by the French bank in due course on the faith of the American Company's indorsement. The trustees allege against the claim of the French Company that the American Company received no consideration for its indorsements of the drafts; that indorsements for accommodation were in excess of its powers; that the French Bankers did not discount the drafts in due course as acceptances of the American Company; that as to the loans they were made to and for the exclusive benefit of the French Company; that the insurance was not assigned to the French Bankers as security for this advance; and that, if the French bank ever had a claim against the American Company, it was lost by releasing the security given to the French Bankers by the French Company.

I am inclined to agree with these statements in the main, but am more impressed with Talcott's evidence and argument that he continued his advances to the American Company from July 28 to October 18, 1905, under the contracts of pledge, and without notice of any alienation by the American Company of their equity in the pledge. In the light of the testimony in his behalf, I cannot assume that he continued to advance large sums of money to the American Company after notice that the company had transferred the collateral to the French Bankers. I therefore conclude that Talcott, as assignee of policies to the amount of $30,000 and as the insured in policies to the amount of $40,000 more, is first beneficiary to the amount of over $60,000 and certain expenses, besides interest, and that the trustees are entitled to receive the remainder, if any, due on the policies. There should be a further hearing before the court to adjust the aggregate amount due and to settle the general form of the decision.

Ordered accordingly.